Good morning. Barbara Strickland. I'm appearing for Cristobal Rodriguez Benitez. May it please the Court. I would first like to direct my comments to the Rule 28J letter submitted by the State of California and the recent decision by the Supreme Court in Medellin v. Dredge in May of 2005. The Medellin case dealt with an alleged violation of Article 36 of the Vienna Convention on Consular Relations. And in that case, the Supreme Court provided somewhat of a checklist of issues that could preclude federal relief. However, it did not decide that any of those issues precluded relief, mentioning that the State of Texas had reopened the proceedings and that the President of the United States had issued a letter indicating that further review would be provided, and the Supreme Court ultimately held that it was unwise to reach and resolve any of those possible obstacles. Nevertheless, I would like to address some of those possible obstacles suggested in Medellin. The first is that a violation of federal statutory rights, or treaty rights in this case, is not cognizable in a post-conviction proceeding unless it meets the fundamental defect test. For that proposition, the Supreme Court made reference to its decision in Reed v. Farley. In Reed, the defendant had complained that the State exceeded time restraints imposed by a multistate agreement, but he had obscured the time prescription and had not objected until after the clock had run. And for that reason, the Supreme Court held that there was scarcely cause for collateral review. But there is an interesting and obvious parallel in this case, because the Supreme Court observed that it would hamper the purpose of that multistate agreement if State court decisions were totally insulated from federal Section 2254 review. In this case, it would obviously hamper treaties and the national uniformity required for treaties if State courts could resist. You know, we read much of what you're saying to us now, and don't you have to tell us how you are here at this point on the 30-year prong when the record shows that the United States said we will not do the death penalty, won't be subjected to the death penalty, and there's no reference to a 30-year maximum? Don't we have to somehow take some steps to get to where you want us to be? That gets, takes away from the Medellin case. But to answer that question, when the Supreme Court of Venezuela approved the request for extradition, it specifically mentioned the 30-year limit. And when Wait a second. Is that right? I thought the record showed that the only condition that Venezuela imposed at the time the Venezuelan Supreme Court granted the extradition request was the death penalty issue, that it was 10 months later that the Venezuelan government, through a diplomatic note, raised the issue with regard to the 30 years. No, Your Honor. I believe Am I misreading the record? I believe so, Your Honor. The decision of the Venezuelan Supreme Court, which is in the record, specifically mentions the 30 years. And there's a letter that was Well, they were told that the punishment was 30 years to life under California law, plus a five-year sentencing enhancement. But I guess maybe I'm confused on the condition that the Venezuelan government subsequently added, which Well, my difference would be I don't believe that condition was subsequently added. I believe it was clear from the very beginning, both from the decree of the Venezuelan Supreme Court, including counsel for the State of California, has argued that we don't even need to look at that decree. So if the decree did not mention that point, then it would be irrelevant. Well, what do we do with the record from the State Department, or the letter from the State Department to the county of San Diego, which essentially says, you know, we make this recommendation, but we're not demanding that you Your Honor I mean, obviously, the State Department is taking a different view than the view you're urging upon us. But I believe that letter is not the type of a reasoned legal opinion that would be the type of opinion that this Court might defer to in determining what the views of the executive are. Well, we have to rely upon the representations by the Department of State and the Department of Justice, which is where that letter comes from, as to what the United States government's on an extradition matter. Are you suggesting that the district attorney for San Diego County was not entitled to read that letter and act in conformity with the advice that it gave him? I'm suggesting that the Department of Justice was mistaken in issuing that letter because of the clear conditions that were expressed both in the decree of extradition, and there is also a notification But what do we do? I mean, we're here now on AEDPA review. We've got a factual determination by the courts below, and you're essentially, I think, arguing the prong under AEDPA, where you have the burden of showing by clear and convincing evidence that that's wrong, that the Department of Justice advice was incorrect, and that the state courts erred when they made the finding. Your Honor, if a foreign country agrees to an extradition and explicitly mentions two conditions to that extradition, and the United States takes custody of a person pursuant to those decrees, I believe it's somewhat ingenuous to say, well, we never really promised you that we would abide by the second condition. But you're asking us on AEDPA review to essentially, I guess, step into the shoes of the Secretary of State and take a position, a legal position, that's different from the one that the Secretary of State, through the Department of Justice, took. And I'm wondering how we can do that under AEDPA, where the question is whether or not the interpretation of the obligations under the speciality condition has been determined adversely to your position in the courts below. And we have to decide whether or not that was contrary to or an unreasonable application of Supreme Court authority. Well, Your Honor, my belief is that it is both contrary to and an unreasonable application of Supreme Court authority, and it goes back to those express conditions which were mentioned twice before the extradition ever took place, both in the Supreme Court decision from the country of Venezuela and in a notification sent by the country of Venezuela to the United States Embassy saying that the extradition had been granted based on those conditions. Also, to support you with that argument, I noticed in the supplemental excerpt of the record, the extradition where it says, said, extradition is conditioned to the understanding that the aforementioned citizen will not be sentenced to death or life in prison or incarceration for more than 30 years according to these provisions. And then you also mentioned the letter notifying the United States of the Venezuelan Supreme Court's decision as providing such evidence, and they were explicit in that, after which then the United States took custody without indicating to Venezuela that those conditions would not be met. Is that your argument? That is my argument, Your Honor. I believe that it was incumbent on United States authorities, if it did not want it to be bound by that second condition, to notify the country of Venezuela prior to the fact of taking custody and extraditing Mr. Rodríguez Benítez. And this would be required by our treaty with Venezuela as well? That is correct, Your Honor. And with respect to whether or not there's a fundamental defect under Reed, I would submit that we're talking about something that's even more fundamental than perhaps the treaty violation under the Vienna Convention. An extradition treaty is the basis of Mr. Rodríguez Benítez being here in the first place. So if it were not for that treaty, he would not be subject to trial and incarceration in this country. Of course, he hasn't been incarcerated for 30 years yet. But that argument, I believe the district court said it was not a right, as the magistrate judge said, dismissed it because it wasn't right that he hadn't served. The district court said it had nothing to do with that. That's correct. And in our briefs, we argued that even there are several cases in our briefs that we mentioned the fact that he hasn't served 30 years yet is not really relevant. There are numerous differences between a life sentence and a sentence for a term of years, including the fact that under the prisoner exchange treaty that the United States has with Mexico, if his sentence were 30 years, he could request to be transferred to Mexico. And that is a significant right that he is deprived of at this time. Mr. Strickland, what would be the bottom line of this court's opinion in your view? I believe the court should remand it to have sentence imposed in accordance to the extradition decree and the treaty obligations with the country of Venezuela. I would also like to issue or to reach one of the issues that the state of California raised in its Rule 28J letter, and that is whether or not the certificate of appealability should be vacated. And in addition to the fact that Medellin does not decide any of the factors that it presented, and rather the 28J letter seems to rely on Phelps, I would submit to the court that, as Justice O'Connor suggested in her dissent in Medellin, that jurisdictional questions may be waived and are not open for review throughout the entire case. I believe the state of California had an obligation to raise that argument before now, and certainly by raising it 11 days before oral arguments in a 28J letter, if this court wishes to entertain that question, perhaps it should provide the opportunity for additional briefing. I would like to turn also to the ADPA analysis, which focuses on the state court decision. The portion of the state court decision in this case which discusses this issue contains less than two pages of text. It does not cite Rauscher or any other Supreme Court authority, and it does not discuss the doctrine of specialty, although the district court judge indicated that perhaps it did implicitly. This court held in Avala v. Galarza that where there is an analysis of the Supreme Court precedent, that a decision that doesn't address the constitutional claim doesn't have anything to defer to. In Brown v. Payton, the Supreme Court indicates that a decision which confronts a set of facts that is materially indistinguishable from a decision of the Supreme Court but reaches a different result can meet that contrary to clause. In this case, I would submit as indistinguishable from Rauscher and Johnson v. Brown. Rauscher specifically provided that the specialty doctrine is conclusive on the judiciary of the rights conferred upon persons brought from a foreign country. That doesn't limit it to whether it's a charge or whether it's a sentence. And in an international context, a sentence – a charge which brings a sentence for life or the death penalty may well be viewed as a separate charge than simply as a matter of sentencing. You had a question? Kagan. There are collateral consequences to one sentence, and how you're treated in prison, there are all sorts of collateral consequences. You didn't mention the case of Brown v. – Johnson v. Brown, which appears to support your argument as well. The case of Johnson v. Brown is on point, Your Honor. And that case, interestingly enough, does consult the opinions of the courts in Canada in determining whether or not there was a violation of the treaty. In Canada, they had disapproved extradition on certain charges and approved them on others. And when the United States accepted custody, it went back and applied the first charges. The only way of even knowing what the charges were or were not was to refer to something outside the four corners of the treaty, and that was the decrees of the courts of the country of Canada in what exactly was the terms of the extradition. And that's what's happened in this case. A sovereign country has allowed extradition, and yet on conditions that were known to the United States from the very beginning, and yet this country has not taken them into consideration. And that is sort of the summary of the why is an unreasonable application. Even if we give it the deference that it's due under ADPA, Rauscher and Johnson v. Brown would demand a contrary result. It's unreasonable for the state, a court in the United States, to substitute its judgment for that of the Supreme Court of a sovereign country. The treaty specifically delegates the final authority for determining whether extradition will lie to the judiciary of the respective countries. Therefore, in this country, the judiciary would determine whether or not extradition would lie. And I submit that this court and other courts in this country would be very appropriately concerned if a foreign country simply ignored one of the express conditions that was placed on extradition. Part of the problem I have in all extradition matters is, to a certain extent, you're talking about the state of our relations with foreign countries. And we have to rely upon the executive branch and the president, whose power in this area is quite broad, in order to make that kind of a decision. What you're asking us to do is to reach a conclusion that is different from the conclusion that the executive branch reached when this issue was presented to the Departments of State and Justice. And I find that a little troubling. I don't deny that it is courts that ultimately decide the question. The problem is, under ADPA, we have to find that it is unreasonable under the standards contained in the statute when the Department of Justice has told us that the position you're advocating is not the position of the United States government. Your Honor, the International Court of Justice disagreed with the executive power of the United States in issuing its decision in the Avena case. And precisely on the basis of the decision in the Avena case, the President of the United States has issued a letter or those cases. This case is not in a very much different position, except for no claim has been brought in the International Court of Justice to this point. However, that is not a remedy that is without possibility to be pursued. But if we go back to the initial decision to allow extradition, had the country of Venezuela known that its conditions would not be respected, it might not have allowed extradition to the country of Venezuela. What in the record suggests that? There's nothing in the record, Your Honor. I would admit that. It's simply a matter of those are the options that the country of Venezuela had. The treaty provides that it is not required to surrender a person for extradition in that case. So that is a right that it has under treaty. And without the treaty, under international law, there is no obligation to surrender persons for extradition. And you could infer from the fact that there were express conditions placed, no death penalty, no life imprisonment, in the extradition document, can you not? Those were explicit in the extradition documents. Right. So that's how we know that probably Venezuela would not have done it had those conditions not been met. I was just trying to address Judge Ferris' question. Thank you, Your Honor. You did a much better job than I could. Do you want to reserve some time? I will reserve some time, Your Honor. Thank you. All right. Let's hear from Mr. Mulford. It's turning to a more interesting case than you thought. It is. Yes, Your Honor. Deputy Attorney General Matthew Mulford for the Word. And I'd like to begin with Judge Ferris' point is the bottom line, and that's the case, is that the treaty doesn't mention 30 years at all. The extradition decree does, Judge Nelson, but the treaty does not. And the United States and the State of California never agreed to 30 years anywhere along the way in our view. And without that agreement in the treaty, I think this case becomes easy. Venezuela had the right under the treaty to request the assurance regarding no death penalty and regarding no life term. The treaty does not give them the right to request 30 years. But my understanding from the State Department is that they traditionally do so now. This is an old treaty, and I believe Venezuelan law may have changed more recently than the date the treaty was enacted. And that may explain why the 30-year decree – excuse me, the 30 years is included as a term in the decree and not in the treaty. What do you do with the extradition document itself and also the letter that came from the Supreme Court of Venezuela? You get a no effect? We believe so, yes. Under the treaty, Venezuela had the right initially to request assurances, and they did on one ground and one ground only, the death penalty. And then after that, everything else is, I hate to say it, but surplusage. I think, you know, the record is silent as to why that language is included and what reasonable inferences we can draw from it. What is a question that we must answer on review? What is our obligation? Under ADEPA, your obligation is to review the state court's merits determinations that found that there was no treaty violation for reasonableness. And based on what the state courts did and based upon these ambiguities that we've discussed. But if you look to California law, they use a contract framework to understand extradition. And, you know, why can't you view the extradition decree as a conditional offer? We will extradite on condition that no death penalty and no life imprisonment. I suppose it could have been interpreted that way, but it was not. It was the offer came sooner. You know, I can't remember, the district, excuse me, the California trial court analogized it to contract terms, but did not find that that explanation or that reasoning was the  case. The United States essentially, we would offer that there was no death penalty and the acceptance was made at that point. And that the additional language regarding particularly the 30 years had no effect. And the State Department seems to believe that that is an acceptable understanding or at least a reasonable understanding of what has happened. And I think that is likely because of the fact that Mr. Benitez, of course, is not a Venezuelan citizen. He was a Mexican citizen. And so Venezuela may have not been as forceful in demanding assurances regarding Mr. Benitez's extradition as they might have been with one of their own citizens. How forceful can you be when it says on condition that there be no death penalty and no life imprisonment in the extradition document? Correct, those words are forceful. They are not the statutorily approved method of demanding assurances though. There was a series of diplomatic notes, there were a series of exchanges. In our view, the only assurances provided by the United States regarded the death penalty. And that's how the state courts viewed it. We believe that's reasonable. That's how the State Department views it and we believe that's reasonable. And under this court, it's a limited review of the ADAPA. That's the end of the case. What about the Brown case where it says the United States is supposed to operate in the highest good faith. How can it be operating in the highest good faith, accepting him under the extradition document and then proceeding to give him the life sentence? We're dealing in international relations here and relationships between and among countries. We're expected to operate at the highest possible level. We are expected to operate at the highest possible level and we do the best we can with the treaties that we have and our ability to talk and exchange diplomatic notes and provide assurances on any grounds that a sovereign nation requests. And when the only ground they request is the death penalty, we believe we have fulfilled our obligations under international law and under this treaty. You know, this is the last case. People's minds could differ, I suppose, but I don't think the state courts were unreasonable in so concluding here, particularly when the Brown v. Johnson case, again, we read much more narrowly than Strickland and we think that it only applies to a particular crime and not the sentence, although it does, of course, have the expanse of language. You know, I'm looking at the treaty here. I have a copy of 43-1690, the extradition treaty of Venezuela and Article 4 says, in view of the abolition of capital punishment and of imprisonment for life by constitutional provision in Venezuela, the contracting parties reserve the right to decline to grant extradition for crimes punishable by death and life imprisonment. How do you view that as not? Venezuela declined to exercise their right not to extradite Mr. Benitez because they knew under California law that he faced the possibility of life imprisonment and that was correctly conveyed to Venezuela and the fact that they extradited him with the understanding, at least the correct understanding, of California law and the possibility of the life terms means that essentially Venezuela waived that aspect of the treaty in this particular case. So it is in the treaty. The life imprisonment is yes, if the 30 years is not. Yes. We've said several times it was not in the treaty. It was in the extradition document and it is in the treaty. I just wanted to point that out. Let me clarify then the treaty mentions death penalty and life imprisonment. The United States was asked about and provided insurances regarding the death penalty only but then of course the extradition documents refer to all three, the death penalty, the life imprisonment, and the 30 years. Thank you. I'd be happy to address the certificate of appeal ability issue if the court is so inclined. I don't think you need to. Thank you very much. Thank you. I'll give you another minute to wrap up. My first comment would be I believe it is not correct to assert that there is one particular statutory method for requesting or giving of insurances. The best of my knowledge there is no such thing. These are handled by diplomatic notes that have an ebb and a flow and that are not in the way of sort of complaints and pleadings that lawyers might be used to. If we use the contract analogy to the extent that it is applicable, my argument would be the discussions in terms of what insurances were given, the death penalty, the description of the California sentencing guidelines would be preliminary negotiations. The offer is, in a sense, the decree of extradition by the Supreme Court of Venezuela. The acceptance would be the United States taking custody of Mr. Rodriguez Benitez and bringing him to this country for prosecution. Certainly at that point, at least they had an obligation to let the country of Venezuela know that that wasn't their understanding and that they did not believe that they would be bound by the 30-year limitation. Thank you. Thank you very much. The case was very well argued and you've given us a lot to think about, so we'll try and puzzle our way through it as soon as we can. That concludes our session for today and we will stand in again. Thank you.
judges: Farris, D.W. Nelson, Tallman